[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 1323-DD
Two cases were consolidated and tried to the court for approximately 12 days in Danbury and Norwalk.
The first case, this one, was CV88 0295669, brought by Frank and Anna Franc, seeking equitable relief and money damages from Bethel Holding Company.
The second action, CV92 0310607, was brought by the same two plaintiffs against Bethel Holding Company, D'Agostino's Nurseries, Inc., and Lou A. Pagiotta. It sounds in fraudulent inducement and breach of contract for which money damages are sought.
The actions each center upon the 1986 development of a commercial nursery endeavor on the southerly side of Route 6 in Bethel which said property is bordered on two sides by the undeveloped land of the plaintiffs.
The first case, brought in 1988, involves alleged damage to plaintiff's land in the summer of 1986 caused by blasting and excavation by defendant, primarily occurring upon defendant's property, which resulted in removal of some of plaintiff's land and a removal of much of the lateral support of plaintiff's land along boundaries thereof. This action may hereinafter be referred to as the lateral support action.
The second case also concerns dealings between the parties in the summer of 1986, shortly before the same blasting and excavation. Its centerpiece is a document under date of July 9, 1986, variously referred to throughout the trial as "letter of agreement" or the "contract", depending upon which counsel made the reference. The issues involved alleged breaches of promises allegedly made by defendant, Lou Pagiotta, to plaintiff, Frank Franc, just prior to the blasting and excavation regarding trees and stone walls on plaintiffs' land. This has most frequently been known as the "contract" action. Decision in this matter will be forwarded separately and subsequently.
Plaintiffs are brother and sister who have always lived together on a piece of land they call the "homestead". Adjacent thereto is an undeveloped piece of land, claimed to be damaged in the lateral support action, approximately 15 acres in size. Plaintiff, Frank Franc, owns this parcel, having acquired it in 1957. This residentially-zoned parcel was, at the time of Mr. CT Page 1323-EE Franc's purchase, essentially landlocked. It could connect to a public road, Walnut Hill Road, only via crossing the "homestead" to it. In 1958, Mr. Franc sought other access for this residential 115-acre parcel and, to that end, bargained with a Mr. and Mrs. Weed for a strip of land running in to the undeveloped residential parcel from State Route 6.[1] The strip varies in width from 50-57 feet; its length is approximately (350) feet and it is zoned commercial.
Also, in 1986, defendant sought to operate a somewhat large commercial nursery operation fronting on Route 6. This property was bordered on its easterly side by the forementioned 50-foot wide commercial strip of plaintiffs and on the rear by plaintiffs' 15 acre residential plot.
The establishment of a nursery as required by defendants required extensive clearing, excavation and building-relocation, largely to expand a flat "floor" of land that lay topographically somewhat lower than the adjoining parcels of plaintiffs.
The excavation-blasting work resulted in a cliff-like wall along most of the length of both plaintiffs' strip and residential parcel. In much of the forementioned boundary length, the drop may fairly be said to be vertical. The danger presented by this configuration had gone largely unaddressed by the time of trial.[2]
Defendant concedes it is liable for harm resulting from its blasting/excavation enterprise and, as a result, the lengthy trial[3] centered heavily upon damage-related matters.[4] Defendant conceded only negligence. It put forth no evidence, however, which served to bar the court from concluding that its conduct recklessly disregarded plaintiffs' land rights, see infra.
Defendant's excavation and blasting has left almost the entirety of the west side length of the narrow strip, as well as the northern boundary of the 15-acre residential property without lateral support. Instead, a steep incline has been created which is, in most stretches, a vertical cliff. The right to enjoy one's land free from harm to the lateral support provided by neighboring land is time-honored and fundamental. Canfield Rubber Co. v.Leary, 99 Conn. 40 (1923); Trowbridge v. True, 52 Conn. 190 (1884).
Evidence also revealed that natural erosion will ultimately restore a form of lateral support, but a kind which will ultimately incur 25 feet into and onto the plaintiffs' lands. That CT Page 1323-FF is to say, the state of natural repose to which the "cliffs" might return will constitute "lateral support", but it is achieved by taking plaintiffs' surface further back (additionally depleting plaintiffs' lands rather than extending the base further onto defendant's land).
This court has concluded that defendant's blasting and excavation conduct was carried out in reckless disregard of the rights of plaintiffs to the natural lateral support of their land, leaving in its wake not only a lack of lateral support, but a nuisance.[5]
The court has found that, as a consequence, the value of plaintiffs' land has suffered serious diminution; further, a hazardous nuisance was left in the wake of the damaging activity.
On the issue of damages, plaintiffs presented an appraiser, Ronald B. Glendinning, whose credibility, experience of forty years and expertise appeared sound and worthy of belief on several of the relevant topics. It is easier to treat first an area upon which the court could not accept the contentions plaintiffs set forth through Mr. Glendinning. It does not appear that the highest best use for plaintiffs' land would probably include an approval of a zone change to RM-O for the residential parcel. ("RM-O" stands for Residential Multi-Family-Office). In this regard, cross examination and countervailing testimony illustrated an unfavorable history and numerous difficulties such as to reduce probability to mere possibility.
Plaintiffs' residential 16 acre plot is and was zoned R-80 (single family dwellings on 80,000 square foot lots). of course, it is a ready conclusion that this use is available and provides a clear benchmark in assessing damages, subject, however, to one caveat: access to this parcel from Route 6 is available only via the 50-foot wide commercially zoned strip, also excavation-damaged. Defendant has urged that the strip's commercial label renders it not available for access to the residential parcel inland. Defendant cites Bethel Zoning Regulation § 118-30 and claims that residential uses are not permitted in CI (commercial) zones. The court rejects this argument and finds that the regulation relied upon presents no impenetrable barrier to utilizing the commercial strip to provide access to the interior 15 acres from Route 6.
Section 118-30 provides: CT Page 1323-GG
 "A. Purpose and Intent: The CI Commercial Zone is intended to permit those commercial uses which provide convenience goods and services to meet the needs of the neighborhood in which they are located as well as limited industrial uses to achieve logical land use."
This section is cited in defendant's brief (p. 27) for the broad proposition that "residential uses are not permitted in CI Zones". This conclusion is too broad to stand upon the regulatory language cited.
Next, defendant cites Section 118-11, which provides:
 "Access to or parking in connection with a use shall be considered to be ACCESSORY to such use and controlled by the same requirements as such use; but this provision shall not prohibit access across a Commercial Zone to a use lying in and Industrial Zone."
From this language, defendant asks the court to agree with its claim that "access to a residential use is a residential use, and is, therefore, not permitted in a CI Zone." Additionally, defendant urges that "although 118-11 does authorize access across a Commercial Zone to a use lying in an Industrial Zone, it does not authorize access across a CI Zone to a residential use."
The court declines the invitation to carry the regulatory language as far. There is no specific prohibition of commercial land accessing residential. Instead, § 118-11 is forgiving in its thrust and gives an example of allowing access across commercial to industrial, that is, in an arguably downward direction. Certainly, there is not enough here to find a regulatory barrier to an upwardly directed access, over commercial to residential.
This is especially so when one can so readily perceive in the language of Section 118-30 that commercial uses are intended largely, or at least significantly, for the benefit of neighborhoods.
Thus, the court finds not only no barrier to a zone change for the commercial strip, but finds sufficient credibility in the testimony to conclude that such permission would be obtained.
Thus, with access likely over the strip leading from Route 6 CT Page 1323-HH to the 16 acre inland plot already zoned for single family homes on lots of 80,000 square feet, one may deem established the parameters within which to assess damages arising from the forementioned taking of lateral support.
Restricted to R-80 usage, the value of the plaintiffs' land pre-excavation was credibly set at $300,000.00 by appraiser Glendinning.
Virtually all trial testimony placed the cost of remediation, under any of several described approaches, as higher, indeed, much higher, at figures often exceeding $500,000.00.
When plaintiffs' expert appraiser, Glendinning, utilized his expected highest and best use (involving a zoning change to RM-O), he contended the pre-damage value of the parcels together to be $595,000.00. The court concludes from the testimony of Mr. Glendinning and plaintiffs' engineer, Ralph Gallagher, that $500,000.00 would be necessary to effect a restoration of lateral support. Under the Glendinning valuation approach, a figure for remediation or repair was employed in subtraction in getting to post-damage value from his pre-damage valuation. Thus, when Mr. Glendinning set forth his RM-O based proposition, he concluded there to be a value, post-damage of $95,000.00.
Plaintiff did not try the case in a fashion which offered the court full exposition, including value after damage, if alternative, less remunerative uses for the subject land were to be concluded by the court. Indeed, plaintiffs purport, in their brief, to prefer purely equitable relief, the full restoration of lateral support. This would require work to be accomplished on and from the land of plaintiffs and defendants, be unwieldy for the court to govern and cost more than the appropriate money damages flowing from diminution in value. As a result, in such situations, money damages are the preferred remedy. See, e.g., Bauby v.Krasow, 107 Conn. 109, 116 (1927). Additionally, it is appropriately conceded in plaintiffs' brief that, within the realm of money damages, "the measure of damages for the removal of lateral support from land is the lesser amount as between the cost of restoring the land to its former condition and the diminution in value of the land." Plaintiffs' brief at P. 11, citing 2 C.J.S.Adjoining Landowners, § 35.
Therefore, while Glendinning's logic was compelling in arriving at $95,000.00 as a post-damage value by subtracting CT Page 1323-II remediation costs from the higher pre-damage value he proposed, that same method, left alone, would reveal arithmetic subtracting the remediation figure, approximately $500,000.00 from pre-damage value. $300,000.00 was the value contemplating R-80 usage, the usage this court finds highest and best. The anomaly presented, of course, is that this approach, strictly employed, leaves one with a post-damage value to plaintiffs of zero. No other method was proposed to meet this difficulty nor was a specific figure, method aside, posited for this circumstance. Even defendant failed to proffer an opposing post-damage value, despite that such value would somewhat mitigate its damages somewhat.
Fortunately, the court is not left without a basis for determining the appropriate residual value. Mr. Franc has long used the property as a wood lot; the acreage cannot be without some worth, for even if the large parcel is landlocked[6], it somewhat repair issue it somewhat enhances the value to plaintiffs of the "homestead" parcel which is two-thirds owned by plaintiffs. The court sets this overall residual value at $40,000.00. This amount also has a rough relationship to reductions the court made in the Glendinning values. (Glendinning's pre-damage value was $595,000.00 premised on RM-O usage. It was $300,000.00 with the existing R-80 usage. His post-damage value, using RM-O, was $95,000.00. The court concludes the residuum to be $40,000.00 in that circumstance. The relationship of $595,000.00 to $300,000.00 is similar to that between $95,000.00 and $40,000.00.).
This opinion earlier suggested that yet another exception existed to any wholesale adoption of Mr. Glendinning's conclusions. The court has come to believe, largely upon the testimony of defendant's engineer, Arthur Howland, that additional legal and engineering costs would have to have been involved in securing permission for the commercial strip to enter upon state Route 6. $15,000.00 is attributed to this surmountable hurdle, reducing defendant's obligation in damages.
As noted, supra, see footnotes 4 and 5 and accompanying text, defendant's conduct in the blasting and excavation project constituted reckless disregard for plaintiffs' rights. The court finds that $100,000.00 is an appropriate award as to punitive damages. The court is not in doubt that reckless disregard was eminently displayed throughout. However, particularly as to the excavation that followed upon the heels of the blasting, even a standard requiring intentional and wanton disregard would be met.See, Collens v. New Canaan Water Co., 155 Conn. 477 (1967). It is CT Page 1323-JJ one thing to suffer the recklessly erroneous placement of drill holes and dynamite; a far cry it is, however, to follow it up with lengthier excavation which revealed via its precision an almost perfect awareness of the location of plaintiffs' boundaries. So close was the cutting away of plaintiffs' lateral support that, by defendant's own evidence, only in inches here and there was there encroachment over the boundary lines.[7]
There had to be abundant time throughout the period of excavation to remedy the wrongdoing, for, in the circumstances, simply to halt largely undoes the harm. That is to say, had the defendant's excavation left a slope from plaintiffs' boundary onto defendant's own land akin to what natural erosion and repose would ultimately produce, much if not all the existing lateral support would have remained in place. Its systematic and precise removal not only had to be intentional but created the hazardous nuisance in the form of a cliff that has remained ever since. Ultimately, as noted earlier, the forces of nature will continue to erode plaintiffs' land surface until a "new" natural slope results, providing a return of lateral support to a then significantly smaller area of plaintiffs' surface. In this vein, it has been noted, in an article discussing in part injunctive relief versus money damages, in realty cases, that "deterrence of conscious wrongdoing . . . can be more justly effected by a court award of punitive as well as compensatory damages." Developments in the Law-Injunctions, 78 Harv. L. Rev. 994, 1006 (1965). As a result, the forementioned punitive damages are awarded.
Additionally, $25,000.00 is further to be paid by defendant to plaintiffs for the specific purpose of abating the nuisance and permitting the plaintiffs to commission and supervise the installation of a staunch fence along the boundaries separating the lands of these litigants. Plaintiffs will cause the commencement of such fencing to occur within 90 days of the receipt of these funds from defendant. The fence shall be placed on defendant's property where space allows and upon plaintiffs' property where the excavation encroachment so requires. The figure contemplates the need to move said fencing back one time as natural repose approaches so that the fencing offers protection between the top or plateau, and the ever more gradual slope.
Plaintiffs claims for "substantial aggravation and emotional distress" (Second Amended Complaint) must be rejected. From plaintiff, Anna Franc, no direct evidence was elicited. That which was elicited from Frank Franc, while credible, was not found to CT Page 1323-KK meet the rather rigid requirements set forth in Kilduff v. Adams,219 Conn. 314 (1991), and its references to Montinieri v. SouthernNew England Telephone Co., 175 Conn. 337 (1978). Specifically, the court did not conclude that defendant should have apprehended that its conduct would not only create an unreasonable risk of emotional distress and the prospect resultant therefrom of "illness or bodily harm", (Id. at 345) which latter phenomenon, in the event, did not occur.
Plaintiffs are awarded $370,000.00 exclusive of attorney's fees and costs.
NADEAU, J.